## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

|  |  |  |
|---|---|---|
| SAMMIE LEE AUSTIN, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: |
| MNGI DIGESTIVE HEALTH, P.A., | ) ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) ) | |

### CLASS ACTION COMPLAINT

Plaintiff Sammie Lee Austin ("Plaintiff"), by and through his undersigned attorneys, brings this Class Action individually and on behalf of all others similarly situated (collectively, "Class Members" or "Class"), against Defendant MNGI Digestive Health, P.A. ("MNGI" or "Defendant"). Plaintiff and Defendant, collectively, are referred to as the "Parties." The following allegations are made upon personal knowledge as to Plaintiff and upon information and belief as to all other matters.

### INTRODUCTION

1.    On August 20, 2023, Defendant's computer system and/or network was the target of a cyberattack that resulted in unauthorized access to the personally identifiable information ("PII") and personal health information ("PHI") of approximately 765,937 persons (the "Data Breach"), including Plaintiff.

2.      PII and PHI includes, among other sensitive information, the person's name, Social Security number ("SSN"), driver's license or state identification number, passport number, date of birth, medical information and health insurance information, payment card information, and account numbers.

3.      Defendant, MNGI Digestive Health, is a nationally recognized gastroenterology healthcare practice with ten clinics in the Twin Cities area and one clinic in Hudson, Wisconsin.

4.      Like all medical professionals, Defendant requires patients to disclose highly sensitive and confidential personal information to receive health care services. Patients, including Plaintiff understand that the doctor-patient privilege protects the confidentiality of this information, Defendant promised to keep the information confidential.  Thus, patients provided PII and PHI with the expectation that Defendant would take reasonable measures to keep their information secure.

5.      Defendant, a medical provider, confirmed patients' expectation of confidentiality by soliciting and receiving the PII and PHI.  Defendant assumed a duty to implement reasonable procedures and protocols, as determined by industry standards, to protect the PII and PHI of its patients from unauthorized disclosure.  The Health Insurance Portability and Accountability Act ("HIPPA"), Section 5 of the Federal Trade Commission Act ("FTC Act"), and other relevant laws and regulations, also imposed a duty to take adequate measures to safeguard patient information.

6.    Defendant breached its duty to safeguard the confidential information of its patients by, among other things, failing to implement and maintain procedures and protocols needed to protect their PII AND PHI from unauthorized access and disclosure.

7.    On or about August 25, 2023, Defendant detected unauthorized activity on its network.[1] An investigation determined that an unauthorized party had gained access to Defendant's network a few days earlier.

8.    On or about September 24, 2023, a group called "AlphV" (also known as "BlackCat") claimed it had stolen over two terabytes of data from Defendant. AlphV threatened to publish the data if not contacted in 48 hours and that "in addition, all violations of storage of sensitive data in the company's system will be published." It is unknown whether Defendant contacted AlphV or recovered the data, or whether AlphV made good on its threat.[2]

9.    It took until June 7, 2024 – nearly a year after the intrusion – for Defendant to figure out that the records of 766,000 patients were affected, and it took another month for Defendant to send a letter notifying the affected patients of the data breach.[3]  In its July 15, 2024 letter, Defendant revealed that the stolen information included the patient's name, Social Security number ("SSN"), driver's license or state identification number, passport

---

[1] https://www.mngi.com/media/721/download?inline= ("The Breach Notification Letter") (last visited July 28, 2024).
[2] https://databreaches.net/2023/09/25/alphv-claims-to-have-hit-mngi-digestive-health-developing/ (last visited July 29, 2024).
[3] *See supra* fn.1.

number, date of birth, medical information, health insurance information, payment card information, and account numbers.[4]

10.    A data breach that gains access to a person's PII or PHI substantially increases that person's risk of being targeted for identity theft, insurance fraud, Medicare fraud, as well as embezzlement and other crimes.  Assuming they are aware of the breach, the person must spend significant amounts of time and money closely monitoring all their health records, financial accounts, and email accounts to ensure that their information is not being used for illicit purposes. In this case, Plaintiff and the rest of the Class were unaware for nearly a year that their PII and PHI had been stolen.

11.    The Data Breach was an actual and foreseeable result of Defendant's inadequate security measures. As a result of Defendant's actions (or lack of action), Plaintiff and Class members now face a substantially increased risk of identity theft, and other crimes from the unauthorized disclosure of their PII and PHI. The harm was exacerbated by months of dithering before MNGI notified its patients of the Data Breach. Plaintiff seeks to hold Defendant liable for the financial, emotional, and other costs imposed upon the Class by Defendant's misconduct.

12.    Accordingly, with this action, Plaintiff, on behalf of himself and all other Class members whose PII and PHI was exposed in the Data Breach, brings claims for negligence, negligence *per se*, breach of fiduciary duty, breach of implied contract, invasion of privacy, and breach of Minnesota consumer protection laws.  Plaintiff seeks

---

[4] *Id.*

declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## THE PARTIES

13.    Plaintiff Sammie Lee Austin is a natural person who resides in Minneapolis, Minnesota.

14.    Plaintiff was at all relevant times a patient at MNGI Digestive Health.

15.    Plaintiff received medical treatment from Defendant and was required to submit his personal confidential information to Defendant to receive health care services. The information provided by Plaintiff included his name, address, date of birth, contact information, driver's license, SSN, certain financial information, and his complete health care record, including the record of services from Defendant.

16.    Defendant, MNGI Digestive Health, is a nationally recognized gastroenterology healthcare practice with ten (10) clinics in the Twin Cities area and one (1) clinic in Hudson, Wisconsin. Defendant maintains its principal place of business at 3001 Broadway Street NE, Suite #120, Minneapolis, MN 55413.

## JURISDICTION & VENUE

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5 million exclusive of interest and costs, and it is a class action in which some members of the class are citizens of states different from Defendant's state. *See* 28 U.S.C. §1332(d)(2)(A).  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction

over the state law claims. This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this District, regularly conducts business in this District, and committed acts and omissions within this District that gave rise to Plaintiff's claims.

18.    Venue is proper under 18 U.S.C. § 1391(b) because Defendant maintains its principal place of business in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

Defendant Solicits, Collects & Retains the PII and PHI of Its Patients

19.    MNGI is a leading gastroenterology healthcare practice, specializing in the diagnosis and treatment of adults and children with Gastrointestinal ("GI") disorders. According to Defendant, its gastroenterologists are board-certified and competent to treat digestive maladies like Crohn's disease, ulcerative colitis, celiac disease, heartburn and acid reflux disease, swallowing disorders, hepatitis and liver disease, biologics and infusion therapy, and other ailments.[5]

20.    Defendant routinely collects and stores sensitive personal and health information as part of its ordinary business. Before treating a patient, Defendant solicits sensitive information such as the patient's name, date of birth, residential and work addresses, SSN, familial or household status, and financial information. Defendant also

---

[5] https://www.mngi.com/ (last accessed July 29, 2024)

obtains the patient's personal health history and healthcare records. In some cases, Defendant may also obtain sensitive personal information about a patient from their "circle of care" (e.g. family, friends, or referring health care professionals).

21.    Upon information and belief, the PII and PHI that Defendant solicits and maintains with respect to each patient includes their full name, residential and work addresses, date of birth, SSN, credit/debit card information, medical history, insurance information, billing information, medical records, photo identification, and other information that Defendant obtains while providing health care services.

22.    Upon information and belief, Defendant required all Class members to provide PII and/or PHI as condition of receiving health services. Defendant, in turn, was required to maintain the confidentiality and adequate security of the information, to comply with statutory and regulatory requirements and to protect patient safety.

23.    Plaintiff and Class Members were justified in trusting Defendant to keep their sensitive information safe because it is generally known that confidential doctor-patient communications must be protected. Thus, Class Members rightly assumed that Defendant had robust security in place to prevent the unauthorized disclosure of their sensitive and confidential patient information.

24.    The belief that patient data would be kept secure was consistent with, and confirmed by, Defendant's privacy policy, which acknowledges the importance of patient confidentiality and promises to "Make certain  that  medical information that identifies you

is kept private and confidential."[6] Defendant further promised "not [to] use or disclose your protected health information without your specific written authorization."[6]

25.    Despite Defendant's representations and promises, its security measures to protect confidential patient information were inadequate.  As a result, the cyber-criminal group "AlphV" was able to hack into Defendant's system and download over two terabytes of information, including the PII and PHI of 765,937 patients.[7]

The August 25, 2023 Data Breach

26.    According to Defendant, on or about August 25, 2023, Defendant detected unauthorized activity within its network. Defendant secured its systems and investigated the matter. Sometime later, Defendant learned that on August 20, 2023, an unknown party had accessed discrete parts of Defendant's network, without authorization.[8]

27.    On September 25, 2023, the website "DataBreaches.net" reported that the criminal hacking group AlphV[9]  had published the following on AlphV's website:

---

[6]   chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.mngi.com/media/555/download?inline   (last visited on July 29, 2024).

[7] *Id.*

[8] *See supra* fn.1.

[9] *See* Circulatory Advisory, "StopRansomware: ALPHVBlackcat," published by the National Coordinator for Critical Infrastructure Security and Resilience, February 27, 2024, found at https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-353a (last visited July 28, 2024).

28.    DataBreaches.net reported that AlphV sent copies of imaged diagnostic tests "as proof of claim," but without any legible corresponding details to identify patients. DataBreaches also said that it tried to reach MNGI for comment on AlphV's statement, but that it had not received a response.[10]

29.    Around this same time, Defendant "then undertook a comprehensive review of the potentially affected data." It was not until June 7, 2024, however, that Defendant determined that the stolen information consisted of patient names, SSNs, driver's license or state identification numbers, passport numbers, dates of birth, medical information and health insurance information, payment card information, and account numbers – and that hundreds of thousands of patient records had been compromised.[11]  Defendant took another month, until July 15, 2024, before it started actually notifying any of the affected patients about the Data Breach.

30.    Defendant's failure to promptly notify Plaintiff and Class Members placed them at a heightened risk that their information will be used for illicit activity, relative to the attendant risk had Defendant informed them sooner than the almost **one year** that had elapsed since their PII and PHI was compromised.

31.    Defendant's undue delay in notifying Plaintiff and Class Members of the Data Breach, prevented them from mitigating the risks resulting from the Data Breach.

32.    Defendant's belated Breach Notification Letter was also grossly deficient. It was silent as to when the date of the breach was determined, how the breach happened,

---

[10] *See supra* n.2.
[11] *See supra* n.1

who was responsible for keeping the data secure, whether Defendant made any attempt to recover the data from AlphV, and what, if any, measures Defendant has taken to prevent such breaches in the future.

33.    The mitigation efforts offered by Defendant in the Breach Notification Letter are also wholly deficient.  It instructs Plaintiff and Class Members how to freeze their credit or put a fraud alert on their accounts but offers no other guidance regarding how to minimize the effects of the Data Breach.  Without these and other details, Plaintiff and Class Members lack the necessary knowledge and/or resources to take effective mitigation steps.

34.    Defendant instructed Plaintiff to "notify your financial institution immediately" if there was any "suspicious activity" with respect to his financial accounts, such as "unauthorized transactions or new accounts opened in your name that you do not recognize." MNGI also reminded Plaintiff about getting his free credit reports every twelve (12) months, and included a link to the  "ID theft" page of the FTC's website.[12] In other words, Defendant seeks to burden Plaintiff with the inconvenience of constantly scrutinizing his credit record for evidence of fraud.  Suffice it to say that Defendant's offer is insufficient to compensate Plaintiff and Class members for the invasion of their privacy interests and the continually imminent threat of identity theft they now face because of Defendant's actions.

<u>MNGI Knew Information It Collected Was Valuable and Should Have Protected It</u>

---

[12] *See supra* n.1.

35.    At all relevant times, Defendant knew, or should have known, that Plaintiff's and Class Members' PII and PHI were targets for hackers. Despite such knowledge, Defendant failed to implement and maintain reasonable and appropriate data privacy and security measures to adequately protect Plaintiff's and Class Members' confidential information from unauthorized disclosure.

36.    By soliciting, receiving, and maintaining Plaintiff's and Class Members' PII and PHI, Defendant assumed the legal and equitable duties imposed by HIPPA, the FTC Act, industry standards, contract, and statutory and common law to keep Plaintiff's and Class Members' PII and PHI confidential, and to protect it from unauthorized access and disclosure.

37.    As a well-known healthcare provider, Defendant also knew or should have known that it was especially susceptible to attacks by cybercriminals. Medical information is one of the most highly sought after categories of information by hackers and other cyber-criminals. Indeed, as the *Economist* once analogized, a user's personal data is "the oil of the digital era." [13]

38.    It is common knowledge in the industry that there is an economic market for PII and PHI — in other words, the same type of information that Defendant collected from its patients. In fact, both types of data are routinely bought and sold for ***real-world dollars.***

39.    In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age,

---

[13] https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data (last visited July 29, 2024).

gender, and location" information" are sold for about "$0.50 per 1,000 people."[14]  This estimate was based upon "industry pricing data viewed by the Financial Times," at the time.[15]

40.    In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30 per name."[16]  That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge"[17] and that the value of a single user's data (within the corporate acquisition context) can vary from $15 to more than $40 per user.[18]

41.    In 2013, the Organization for Economic Cooperation and Development ("OECD") published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value," which measured prices charged for data derived from "various online data warehouses."[19]  OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [i.e. $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD

---

[14] Emily Steel, et al., *How much is your personal data worth?,* FIN. TIMES (June 12, 2013), https://ig.ft.com/how-much-is-your-personal-data-worth/#axzz3myQiwm6u (last accessed on July 29, 2024).
[15] *Id.*
[16] Pauline Glickman and Nicolas Glady, *What's the Value of Your Data?,* TECHCRUNCH (Oct. 13, 2015), https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/ (last visited on July 29, 2024).
[17] *Id.*
[18] *Id.*
[19] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD DIGITAL ECONOMY PAPERS, No. 220 (Apr. 2, 2013), https://www.oecd-ilibrary.org/docserver/5k486qtxldmq-en.pdf?expires=1630429771&id=id&accname=guest&checksum=EE508E4C5722D02DCC45931B4D7B63A0.

35 for a military record. A combination of address, date of birth, social security number, credit record and military [was] estimated to cost USD 55."[20]

42.    The OECD published in this same paper a chart demonstrating the various "Market prices for personal data by type":[21]

**Figure 7.  Market prices for personal data by type**

(per record)



\* two different prices provided by different providers.

*Sources:* Locate Plus (address Unpublished Phone Number  Felony) Pallorium (address, past address Unpublished Phone Number Social Security Number) KnowX via Swipe Toolkit (Past address, Marriage/Divorce Bankruptcy Information Business Ownership) LexisNexis via Swipe Toolkit (Education Background Employment History Social Security Number  Felony sex offender) Experian (Credit History) Voters online.com (voter registration)

43.    The value of PII fluctuates based upon demographics, race, and background, as analyzed in a 2020 study by *MacKeeper* and YouGov (an international research and

---

[20] *Id.*
[21] *Id.* at 26.

data-analytics firm).[22] As reported by *Invisibly* on July 13, 2021, the study showed that "personal data for 18-24-year-olds is notably higher than any other demographic, while businesses have shown a willingness to pay significant amounts for personal data from Black and Middle Eastern audiences."[23]  The study published the following information:

| Demographic | | Cost for Data Per Person | Percentage of Population |
|---|---|---|---|
| Sex Assignment | Male | $0.15 | 48.59% |
| | Female | $0.14 | 51.41% |
| Age | Age 18-24 | $0.36 | 11.92% |
| | Age 55+ | $0.05 | 32.33% |
| Ethnicity | Middle Eastern | $0.62 | 1.21% |
| | Hispanic | $0.01 | 8.09% |
| Family Annual Income | $40,000-$49,999 | $0.02 | 4.94% |
| | $120,000-$149,999 | $0.33 | 1.84% |

44.    There is also a market for PII and PHI on the "Dark Web."  As one commentator notes, "As of May 2021, you can buy access to a hacked Facebook account on the dark web for $65 (or its crypto equivalent), an entire US voter database for $100, and even a hacked Coinbase verified account for $610."[24]

---

[22] Ruslana Lishchuk, *Most Desired Data: Whose is the most in demand, and how much is it worth?*, MACKEEPER (Nov. 16, 2020), https://mackeeper.com/blog/most-desired-data/ (last visited July 19, 2024).
[23] *How Much is Your Data Worth? The Complete Breakdown for 2021*, INVISIBLY (July 13, 2021), https://www.invisibly.com/learn-blog/how-much-is-data-worth (last visited July 19, 2024).

[24] *Id.*

45.    PHI is viewed by hackers as especially valuable and has been called a "treasure trove for criminals."[25] Indeed, in 2021, stolen healthcare records went for as much as $1000 on the black market.[26] *Invisibly* reported that personal medical information is one of the ***most valuable pieces of data*** within this data-market: "It's worth acknowledging that because health care records often feature a more complete collection of the patient's identity, background, and personal identifying information (PII), health care records have proven to be of particular value for data thieves.  While a single social security number might go for $0.53, a complete health care record sells for $250 on average. For criminals, the more complete a dataset, the more potential value they can get out of it. As a result, health care breaches increased by 55% in 2020."[27]

46.    The *Invisibly* article noted average prices for each record type:

---

[25] *See* Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH MAGAZINE (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-    perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.") (last visited July 28, 2024).

[26] Paul Nadrag, *Industry Voices-Forget credit card numbers. Medical records are the hottest items on   the  dark web*, FIERCE  HEALTHCARE  (Jan.  26,  2021),  https://www.fiercehealthcare.com/hospitals/industry-voices-forget-credit-card-numbers-medical-  records-are-hottest-items-dark-web ) (last visited July 28, 2024).

[27] *Id.*

| Record Type | Average Price |
|---:|---|
| Health Care Record | $250.15 |
| Payment Card Details | $5.40 |
| Banking Records | $4.12 |
| Access Credentials | $0.95 |
| Social Security Number | $0.53 |
| Credit Record | $0.31 |
| Basic PII | $0.03 |

47.    Thus, PII and PHI are essentially commodities with significant, quantifiable value on the black market.[28]    As a leading gastroenterology provider that routinely collected and stored PII and PHI, Defendant was on notice that the information it collected had economic value, and should have taken sufficient steps to protect it.

Defendant Failed to Comply with Its Statutory Obligations

48.    The Health Insurance Portability and Accountability Act ("HIPPA") requires covered entities to implement reasonable security measures to protect patient information, including protected health information, defined as "individually identifiable health information" which either "identifies the individual" or where there is a "reasonable basis

---

[28] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192 (last visited July 28, 2024).

to believe the information can be used to identify the individual," that is held or transmitted by a healthcare provider. *See* 45 C.F.R. § 160.103.

49.    HIPPA further prohibits the unauthorized disclosure of protected health information.

50.    Defendant is a HIPPA covered entity that provides healthcare services. *See* 45 C.F.R. § 160.12. As a regular and necessary part of its business, Defendant collects and maintains the PII and PHI of its patients.

51.    HIPPA requires that MNGI implement safeguards to prevent unauthorized use or disclosure of private information such as PII and PHI by adopting the requirements set forth in the HIPPA's Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information), and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and C ("Security Standards for the Protection of Electronic Protected Health Information").

52.    Defendant also is required to report any unauthorized use or disclosure of that information, including incidents of a data breach "without unreasonable delay and in no case later than 60 days following discovery of the breach." *See* 45 C.F.R. § 164.302.

53.    As a HIPPA-covered entity, MNGI assumed legal obligations and knew or should have known that it was responsible for safeguarding Plaintiff's and Class Members' sensitive and private information from unauthorized disclosure.

54.    As alleged throughout this Complaint, Defendant did not follow HIPPA's mandate to implement necessary and adequate safeguards, despite knowing its HIPPA

obligations and the risk of harm from unauthorized access to Plaintiff's and Class members' PHI.

55.    Defendant's HIPPA violations include the following:

a.  Failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits. 45 C.F.R. § 164.306(a)(1);

b.  Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of PHI. 45 C.F.R. § 164.306(a)(2);

c.  Failing to protect against any reasonably anticipated uses or disclosure of electronic PHI that is not permitted. 45 C.F.R. § 164.306(a)(3);

d.  Failing to ensure compliance with HIPPA security standards by Defendant's workforce. 45 C.F.R. § 164.306(a)(4);

e.  Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights. 45 C.F.R. § 164.312(a)(1);

f.  Failing to implement policies and procedures to prevent, detect, contain and correct security violations. 45 C.F.R. § 164.308(a)(1);

g.  Failing to identify and respond to suspected or known security incidents and failing to mitigate the harmful effects of security incidents that are known. 45 C.F.R. § 164.308(a)(6)(ii);

h.  Failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry our their functions and to maintain security of PHI. 45 C.F.R. § 164.530(b); 45 C.F.R. § 164.308(a)(5); and

i.  Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI. 45 C.F.R. § 164.530(c).

56.  As a result of Defendant's failure to comply with HIPPA regulations, cybercriminals circumvented Defendant's lax security measures, directly resulting in the Data Breach that injured Plaintiff and Class Members.

57.  The Federal Trade Commission Act ("FTC Act") prohibits Defendant from engaging in "unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45.

58.  The Federal Trade Commission ("FTC") has promulgated cyber-security guides for businesses, reflecting the importance of maintaining effective data security policies and procedures.

59.     The FTC's publication, *Protecting Personal Information*, established cyber-security guidelines for businesses. The guidelines provide that businesses should take action to protect the personal patient information that they collect; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their networks' vulnerabilities; and implement policies to correct any security problems.[29]

60.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for any indication that the system is being hacked; watch for a high volume of data being downloaded from the system; and have a response plan ready if there is a breach.[30]

61.     The FTC further recommends that a business not keep private information on its system for longer than is needed for authorization of a transaction; limit access to sensitive information; require complex passwords be used on networks; use industry-tested methods for security; monitor for suspicious activity on the networks; and verify that third-party service providers have implemented reasonable security measures.

62.     The FTC has the authority to bring enforcement actions against businesses for failing to adequately protect PII and PHI under Section 5 of the FTC Act.  15 U.S.C. § 45.

---

[29] *Protecting Personal Information: A Guide for Business, Federal Trade Commission* (2016). Available at https://www.ftc.gov/business-guidance/resources/protecting-personal-information- guide-business (last visited July 19, 2024).
[30] *Id.*

63.     As alleged herein, Defendant failed to properly design and implement data security practices to protect the PII and PHI of Plaintiff and the Class.

64.     At all relevant times, Defendant was fully aware of its obligations to protect patients' PII and PHI, and of the significant consequences that would result from its failure to do so.

65.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

66.     As a result of Defendant's failures, cybercriminals circumvented Defendant's security measures, causing the Data Breach.

<u>Defendant Failed to Adhere to Industry Standards</u>

67.     Because of they are at such a high risk of cyberattacks, healthcare providers like MNGI implement cyber-security measures to the point that an industry standard has developed with respect to reasonable and adequate cybersecurity policies and practices.

68.     The practices utilized by healthcare providers include, but are not limited to: educating and training employees about the risks of cyberattacks, strong passwords, multi-layer security such as firewalls, anti-virus and malware software, encryption, multi-factor authentication, backup data, limitation of employees with access to sensitive data, setting up network firewalls, switches and routers, monitoring and limiting the network ports, and monitoring and limited access to physical security systems.

69.     Defendant failed to meet the minimum standards of any of the following: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

70.     Defendant's failure to implement the industry standards described herein resulted in the Data Breach and caused injury to Plaintiff and Class members.

Plaintiff & Class Members Were Harmed By the Data Breach

71.     Plaintiff and the Class were injured by the Data Breach.  The Data Breach was an invasion of their privacy, as is the ongoing threat that their sensitive medical information will be exposed or used for illicit purposes.

72.     Plaintiff and Class Members also face the real possibility that they will be forced to pay out-of-pocket for bills they did not incur, to restore their credit, or to otherwise clean up the mess created by Defendant's incompetence. In fact, one 2010 study found that the "average total cost" of medical identity theft is approximately $20,000 per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore health care coverage.[31]

---

[31]   Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims (last visited July 29, 2024).

73.     The Federal Trade Commission ("FTC") warns consumers about the different ways identity thieves use PII and PHI to commit crimes.[32] For example, criminals can obtain PII like a driver's license or official identification card in the victim's name, but with the thief's picture, and use the victim's name and SSN to obtain government benefits or file a fraudulent tax return seeking a refund in the victim's name. Identity thieves may also obtain a job using the victim's SSN, or rent a house, and may even give the victim's personal information to police during an arrest – resulting in an arrest warrant being issued in the victim's name.[33] A thief may use stolen PHI to  receive medical services in the victim's name, or to extort a financial payment from the victim by "leveraging details specific to a disease or terminal illness."[34]

74.     Because of Defendant's actions, Plaintiff and the Class now face the continual danger that their exposed information will be viewed, shared, and/or used for illicit purposes.[35]  The continual need to monitor their financial accounts and other records exacerbates their injuries, along with the anxiety from having their medical information under constant threat. Plaintiff and the Class are also injured to the extent they had (or will have) to pay out-of-pocket costs because of the Data Breach.

---

[32] *See What to Know About Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER ADVICE, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last visited July 29, 2024).

[33] *See Warning Signs of Identity Theft*, FEDERAL TRADE COMMISSION, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last visited July 28, 2024).

[34] Identity Theft Resource Center, 2023 Consumer Impact Report, available for download at: https://www.idtheftcenter.org/publications/ (last visited July 19, 2024).

[35] See World Privacy Forum, *The Geography of Medical Identity Theft* (Dec. 12, 2017), available for download at: https://www.worldprivacyforum.org/2017/12/new-report-the-geography-of-medical-identity-theft/(describing various financial, social, and other ways consumers are injured when their medical information is stolen) (last visited July 19, 2024)..

75.    Thus, for the reasons mentioned above, Plaintiff and Class Members have suffered injury directly attributable to Defendant's failure to implement and maintain adequate security measures, including, but not limited to: (i) a significantly higher risk of identity theft and medical theft, which justifies protective services for which Plaintiff and Class members are entitled to compensation; (ii) the improper disclosure of their confidential information; (iv) the invasion of their privacy; (v) the deprivation of the value of their information, for which there is a well-defined  market; and/or (vi) the time and resources needed to mitigate and remediate the effects of the Data Breach.  Plaintiff and the Class are entitled to monetary and injunctive relief to redress the adverse impact of Defendant's conduct.

<u>Plaintiff Austin's Information Was Stolen from MNGI's system</u>

76.    Plaintiff Sammie Lee Austin is a patient of Defendant.

77.    As a condition of receiving medical treatment from Defendant, Plaintiff was required to provide private information to Defendant including his name, address, email address, driver's license information, SSN, financial information, and complete health information.

78.    Upon information and belief, Defendant retained Plaintiff's private information in its system at the time of the Data Breach.

79.     On July 17, 2024, Plaintiff received the July 15, 2024 Breach Notification Letter from Defendant, which identified him as a victim whose "personal and protected health information was potentially affected by this incident."

80.     The letter disclosed that information stolen included Plaintiff's "name and Date of Birth and Medical Information."

81.     Plaintiff is careful about sharing his private information. Plaintiff stores any documents containing medical or other private information in a safe and secure location. Plaintiff would not have entrusted his private information with Defendant had he known Defendant was neglecting its cybersecurity obligations.

82.     As a result of Defendant's failure to implement and maintain adequate security measures, Plaintiff's PII and/or PHI were improperly accessed and obtained by unauthorized third parties in the Data Breach.

83.     Since the announcement of the Data Breach, Plaintiff has had to spend valuable time monitoring his various accounts to detect and prevent any misuses of his PII and/or PHI. Plaintiff would not have had to spend this time monitoring his accounts but for the Data Breach.

84.     As a result of the Data Breach, Plaintiff suffered actual injury including, but not limited to: (i) a substantially increased risk of identity theft and medical theft; (ii) improper disclosure of his PII and PHI; (iii) breach of the confidentiality of his PII and PHI; (iv) invasion of his privacy; (v) deprivation of the value of his PII AND PHI, for which there is a well-established national and international market; and/or (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the

increased risks of identity theft and medical identity theft he faces and will continue to face.

85.     The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which is amplified by the fact that key details about the Data Breach are still unknown, and Plaintiff's stolen PII and/or PHI are still at risk of being used for fraudulent activity.

## CLASS ALLEGATIONS

86.     Plaintiff brings this class action individually and on behalf of all persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), and 23(b)(3).

87.     Plaintiff seeks certification of Classes as defined below, subject to amendment:

> **Nationwide Class**
> All individuals in the United States whose PII and/or PHI was compromised in the Data Breach that MNGI Digestive Health, P.A. experienced on August 20, 2023 (the "Class").
>
> **State Subclass**
> All individuals residing in Minnesota whose PII and/or PHI was compromised in the Data Breach that MNGI Digestive Health, P.A. experienced on August 20, 2023 (the "Minnesota Subclass").

88.     Excluded from the Classes are Defendant and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

89.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same

evidence as would be used to prove those elements in individual actions alleging the same claims.

90.    <u>Numerosity</u>. The members of the Class are so numerous that joinder of all Class members in a single proceeding would be impracticable. It has been reported to the Maine Attorney General that approximately 765,937 people were affected by the Data Breach.

91.    <u>Commonality</u>.   Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

      a.   Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII and PHI from unauthorized access and disclosure;

      b.   Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII and PHI;

      c.   Whether Defendant breached its duties to protect Plaintiff's and Class members' PII and PHI;

      d.   Whether Defendant breached its fiduciary duty to Plaintiff and the Class;

      e.   When Defendant learned of the date of the Data Breach;

      f.   Whether Defendant knew or should have known that its data security systems and monitoring procedures were deficient;

g.  Whether hackers obtained Plaintiff's and Class Members' data in the Data Breach;

h.  Whether an implied contract existed between Defendant and Class members that Defendant would implement and maintain reasonable security measures to protect and secure Class Members' PII and PHI from unauthorized access and disclosure;

i.  Whether Defendant's conduct violates the Minnesota Consumer Fraud Act, Minn. Stat. §§ 325F.68, et seq. and Minn. Stat. §§ 8.31, *et seq*.;

j.  Whether Defendant's conduct violates the Minnesota Health Records Act, Minn. Stat. § 144.291, *et seq*.;

k.  Whether Plaintiff and Class Members are entitled to an injunction against further non-compliance with HIPPA and other regulatory statutes;

l.  Whether Plaintiff and the Class relief are entitled to identity theft protection to redress the imminent harm they face due to the Data Breach; and

m.  Whether Plaintiff and all other members of the Class are entitled to monetary damages, and the measure of such damages and relief.

92.    Typicality. Plaintiff's claims are typical of the claims of the Class. Like all members of the proposed Class, Plaintiff's PII and PHI were compromised in the Data Breach. Plaintiff and Class Members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as alleged herein. As such, Plaintiff's claims arose from the same practices that gave rise to the claims of all Class Members.

93.    Adequacy of Representation. Plaintiff will fairly and adequately protect the interests of Class members. Plaintiff has no interests adverse to, or in conflict with, the Class he seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature. Plaintiff is familiar with the obligations of a class representative and will zealously pursue the interests of the Class.

94.    All members of the proposed Class are readily ascertainable. As the July 15, 2024, Breach Notification Letter demonstrates, contact information for affected persons is available from Defendant's business records.

95.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1) and (3).  The prosecution of several actions by individual plaintiffs would create a risk of inconsistent rulings that would set incompatible standards of conduct for Defendant. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to the court system as well as the parties.

96.    The common questions set forth above predominate over any individual questions, a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in

the management of this class action. Data Breach classes have been certified before without insurmountable problems. The damages and other financial detriment suffered by Plaintiff and Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class Members to individually seek redress from Defendant's wrongful conduct. Even if Class Members could each afford individual litigation, the court system could not. A class action presents far fewer management difficulties, provides economy of scale, and helps ensure comprehensive, consistent supervision by a single court.

## COUNT ONE
### (NEGLIGENCE PER SE)

97.    Plaintiff incorporates herein by reference, all preceding paragraphs as if set forth herein.

98.    Pursuant to, *inter alia*, (i) the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules") and (ii) Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," Defendant had a duty to employ reasonable measures to protect and secure the PII and PHI of Plaintiff and the Class.

99.    Defendant violated HIPAA Privacy and Security Rules and Section 5 of the FTC Act, by failing to use reasonable measures to protect Plaintiff's and Class members' PII and PHI and failing to comply with applicable cybersecurity standards of the healthcare industry.  Defendant's conduct was particularly egregious in this case, given the nature and amount of PII and PHI it keeps on its system and the foreseeable consequences of a data breach involving PII and PHI including, specifically, the substantial injury that such a breach would cause to Plaintiff and other Class Members.

100.    Defendant's violations of HIPAA Privacy and Security Rules and Section 5 of the FTC Act constitute negligence *per se.*

101.    As medical patients, Plaintiff and Class members are within the class of persons that the HIPAA Privacy and Security Rules and Section 5 of the FTC Act were intended to protect.

102.    The harm that occurred because of the Data Breach is the type of harm HIPAA Privacy and Security Rules and Section 5 of the FTC Act were intended to guard against.

103.    It was reasonably foreseeable to Defendant that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII and PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class Members' PII and PHI to unauthorized individuals.

104.    The injury and harm that Plaintiff and the Class Members suffered was the direct and proximate result of Defendant's violations of HIPAA Privacy and Security Rules, and Section 5 of the FTC Act. Plaintiff and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services; (ii) identity theft; (iii) improper disclosure of their PII and/or PHI; (iv) breach of the confidentiality of their PII and/or PHI; (v) deprivation of the value of their PII and/or PHI, for which there is a well-defined market; and/or (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

105.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiff and the Class have suffered and will continue to suffer other forms of injury, including but not limited to, anxiety, emotional distress, invasion of privacy, and other economic and non-economic losses.

106.    Plaintiff and the Class Members are entitled to damages for the injuries incurred as a result of the Data Breach in an amount to be proved at trial, injunctive relief, attorney fees, costs and disbursements, and all other relief the Court deems appropriate.

## COUNT TWO
## (NEGLIGENCE)

107.    Plaintiff incorporates herein by reference, all preceding paragraphs as if set forth herein.

108.    Defendant requires that its patients, including Plaintiff and Class members, submit private information such as PII and PHI in the course of providing its medical services.

109.    Defendant solicited, received, and stored Plaintiff's and Class Members' private information.

110.    Plaintiff and Class members entrusted Defendant with their private information and reasonably expected Defendant to safeguard their information.

111.    Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in safeguarding and protecting their private information in its possession, custody, or control from the unauthorized disclosure of such information.

112.    Defendant's duty to exercise reasonable care arises from several sources, including but not limited to common law, the HIPPA, the FTC Act, industry standards, and other statutory law.

113.    Defendant's duty also arose from its position as a healthcare provider. As a healthcare provider, Defendant assumed a duty to exercise reasonable care in safeguarding and protecting patients' private information in its possession, custody, or control from the unauthorized disclosure of such information.

114.    Defendant breached its duty by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII and PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII and PHI entrusted to it—including Plaintiff's and Class Members' PII and PHI.

115.    Defendant's negligence or breach of its duties to Plaintiff and Class Members caused their PII and PHI to be compromised in the Data Breach.

116.    It was reasonably foreseeable that the failure to implement adequate data security procedures would result in injuries to Plaintiff and Class Members. Defendant knew about the sensitivity of Plaintiff's and Class Members' private information, and the consequences that would result from the unauthorized disclosure of such information. Defendant knew that healthcare entities were the target of cyberattacks in the past, and that Plaintiff and Class Members were the foreseeable and probable victims of any inadequate data security procedures.

117.    The injury and harm that Plaintiff and the other Class Members suffered was the direct and proximate result of Defendant's conduct. Plaintiff and Class Members have suffered (and will continue to suffer) economic and other injury in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft, justifying reimbursement for credit monitoring and other remedial measures; (ii) identity theft; (iii) improper disclosure of their PII and/or PHI; (iv) breach of the confidentiality of their PII and/or PHI; (v) diminished value of their PII and/or PHI, for which there is a well-defined

market; and/or (vi) lost time and money spent to mitigate the effects of the Data Breach, including the increased risk of identity theft that they face and will continue to face.

118.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury, including but not limited to, anxiety, emotional distress, invasion of privacy, and other economic and non-economic losses.

119.    Plaintiff and Class Members are entitled to damages for the injuries incurred as a result of the Data Breach in an amount to be proved at trial, injunctive relief, attorney fees, costs and disbursements, and all other relief the Court deems appropriate.

## COUNT THREE
### (BREACH OF FIDUCIARY DUTY)

120.    Plaintiff incorporates herein by reference, all preceding paragraphs as if set forth herein.

121.    Plaintiff and Class Members gave MNGI their PII and PHI in confidence, trusting Defendant to protect the information from unauthorized exposure. Plaintiff and Class Members would not have provided their information to MNGI had they known the data would not be adequately protected. MNGI's acceptance and storage of Plaintiff's and Class Members' PII and PHI created a fiduciary relationship between Defendant and Plaintiff and Class Members. In light of this relationship, Defendant was required to act primarily for the benefit of its patients, which included safeguarding and protecting Plaintiff's and Class Members' PII and PHI.

122.    Defendant had a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of their relationship. It breached that duty by failing to properly protect the system containing Plaintiff's and Class Members' PII and PHI, failing to comply with the data security guidelines set forth by HIPAA and the FTC Act, and otherwise failing to safeguard Plaintiff's and Class Members' PII and PHI.

123.    The injury and harm that Plaintiff and the other Class Members suffered was the direct and proximate result of Defendant's conduct.  Plaintiff and Class Members have suffered (and will continue to suffer) economic and other injury in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft, justifying reimbursement for credit monitoring and other remedial measures; (ii) identity theft; (iii) improper disclosure of their PII and/or PHI; (iv) breach of the confidentiality of their PII and/or PHI; (v) diminished value of their PII and/or PHI, for which there is a well-defined market; and/or (vi) lost time and money spent to mitigate the effects of the Data Breach, including the increased risk of identity theft that they face and will continue to face.

124.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury, including but not limited to, anxiety, emotional distress, invasion of privacy, and other economic and non-economic losses.

125.    Plaintiff and Class Members are entitled to damages for the injuries incurred as a result of the Data Breach in an amount to be proved at trial, injunctive relief, attorney fees, costs and disbursements, and all other relief the Court deems appropriate.

## COUNT FOUR
## (BREACH OF CONTRACT)

126.    Plaintiff incorporates herein by reference, all preceding paragraphs as if set forth herein.

127.    Plaintiff and Class Members entered contracts with Defendant when they obtained medical services, or otherwise provided PII and/or PHI to Defendant.

128.    In exchange for providing medical services, Defendant promised to safeguard and protect the PII and PHI of Plaintiff and the Class Members.

129.    Defendant made express promises to Plaintiff and the Class that:

    a.    Defendant is required by law to "[m]ake certain that medical information that identifies you is kept private and confidential;"

    b.    Defendant will not "will not use or disclose your protected health information without your specific written authorization;" and

    c.    Defendant will "[a]bide by our current Notice of Privacy Practices."

130.    These and other express promises are set forth on Defendant's website and/or within other materials provided to Plaintiff and Class Members upon receiving medical services from Defendant.

131.   These promises to Plaintiff and Class Members formed the basis of the bargain between Plaintiff and the Class Members, on the one hand, and Defendant, on the other.

132.   Plaintiff and Class Members would not have provided their confidential information to MNGI had they known it would not safeguard the information from unauthorized access or disclosure.

133.   The injury and harm that Plaintiff and the other Class Members suffered was the direct and proximate result of Defendant's conduct.  Plaintiff and Class Members have suffered (and will continue to suffer) economic and other injury in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft, justifying reimbursement for credit monitoring and other remedial measures; (ii) identity theft; (iii) improper disclosure of their PII and/or PHI; (iv) breach of the confidentiality of their PII and/or PHI; (v) diminished value of their PII and/or PHI, for which there is a well-defined market; and/or (vi) lost time and money spent to mitigate the effects of the Data Breach, including the increased risk of identity theft that they face and will continue to face.

134.   As direct and proximate result of Defendant's wrongful conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury, including but not limited to, anxiety, emotional distress, invasion of privacy, and other economic and non-economic losses.

135.   Plaintiff and Class Members are entitled to damages for the injuries incurred as a result of the Data Breach in an amount to be proved at trial, injunctive relief, attorney fees, costs and disbursements, and all other relief the Court deems appropriate.

**COUNT FIVE**
**(BREACH OF IMPLIED CONTRACT)**

136. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

137. In connection with obtaining medical services from MNGI, Plaintiff and all other Class Members entered into implied contracts with Defendant or were intended third-party beneficiaries of contracts between Defendant and others.

138. Pursuant to these implied contracts, money was paid to Defendant, whether directly from patients or their insurance carriers, and Defendant gathered and stored the PII and PHI of its patients, including Plaintiff and Class Members. In exchange, Defendant impliedly agreed to, among other things, take reasonable measures to protect the security and confidentiality of patients' PII and PHI, including that of Plaintiff and the Class; and to protect the PII and PHI by  complying with federal and state laws and regulations and applicable industry standards.

139. The protection of PII and PHI was a material term of the implied contracts between Defendant and its patients, and/or between Defendant and one or more third parties that provided cybersecurity, with patients being the intended third party beneficiaries of the latter.  The PII and PHI of Plaintiff and the Class was included in the information to be protected.

140. Plaintiff and Class Members, and third parties, fulfilled their obligations under the implied contracts.

141.   Defendant breached its implied contractual obligations by failing to implement and maintain reasonable data security measures to protect and secure the PII and PHI, and by failing to implement and maintain security protocols and procedures that would protect Plaintiff's and Class Members' PII and PHI in a manner that complies with applicable laws, regulations, and industry standards.

142.   Defendant's breach of its obligations of its implied contracts directly resulted in the Data Breach and the injuries that Plaintiff and all other Class Members have suffered from the Data Breach.

143.   Plaintiff and all other Class Members were injured by Defendant's breach of implied contracts because: (i) they paid Defendant for data security protection of minimal value, if not worthless; (ii) a substantially increased risk of identity theft and medical theft, justifying reimbursement for credit monitoring and other remedial measures; (ii) identity theft; (iii) improper disclosure of their PII and/or PHI; (iv) breach of the confidentiality of their PII and/or PHI; (v) diminished value of their PII and/or PHI, for which there is a well-defined market; and/or (vi) lost time and money spent to mitigate the effects of the Data Breach, including the increased risk of identity theft that they face and will continue to face.

144.   As a direct and proximate result of Defendant's breaches, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury, including but not limited to, anxiety, emotional distress, invasion of privacy, and other economic and non-economic losses.

145.    Plaintiff and Class Members are entitled to damages for the injuries suffered as a result of the Data Breach in an amount to be proved at trial, injunctive relief, attorney fees, costs and disbursements, and all other relief the Court deems appropriate.

## COUNT SIX
### (INVASION OF PRIVACY)

146.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

147.    Defendant invaded Plaintiff's and Class Members' right to privacy by allowing the unauthorized access to Plaintiff's and Class Members' PII and PHI and by negligently maintaining the confidentiality of Plaintiff's and Class Members' PII and PHI, as alleged herein.  Defendant further invaded Plaintiff's and Class Members' privacy by permitting third parties to access, disclose and publish Plaintiff's and Class members' PII and PHI online.

148.    The intrusion was offensive and objectionable to Plaintiff, Class Members, and to the reasonable person in that Plaintiff's and Class Members' PII and PHI was disclosed without prior written authorization of Plaintiff and other Class Members.

149.    The intrusion was into a place or thing that was private, and was entitled to be private, in that Plaintiff and the Class Members provided and disclosed their PII and PHI to MNGI  in confidence, trusting Defendant to keep their PII and PHI confidential and protected from unauthorized disclosure. Plaintiff and the Class Members reasonably

believed their information would be kept private and would not be disclosed without their written authorization.

150.    As a direct and proximate result of Defendant's acts described throughout this Complaint, Plaintiff's and the Class Members' PII and PHI was viewed, distributed, and used by persons without prior written authorization and Plaintiff and the Class Members suffered damages as described herein.

151.    Defendant has committed oppression, fraud, or malice by permitting the unauthorized disclosure of Plaintiff's and the Class Members' PII and PHI with a willful and conscious disregard of Plaintiff's and the Class Members' right to privacy.

152.    Plaintiff and Class members have no adequate remedy at law for the injuries in that a judgment for the monetary damages will not end the invasion of privacy for Plaintiff and the Class, and Defendant may freely treat Plaintiff's and Class Members' PII and PHI with sub-standard and insufficient protections without intervention by this Court.

153.    Unless until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause Plaintiff and the Class Members great and irreparable injury in that the PII and PHI maintained by Defendant can be viewed, printed, distributed, and used by unauthorized persons.

## COUNT SEVEN
## (VIOLATION OF MINNESOTA CONSUMER FRAUD ACT)

154.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

155.    Defendant, Plaintiff, and Class Members are each a "person" as defined by Minn. Stat. § 325F.68(3).

156.    Defendant's goods, services, commodities, and intangibles are "merchandise" as defined by Minn. Stat. § 325F.68(2).

157.    Defendant engaged in "sales" as defined by Minn. Stat. § 325F.68(4).

158.    Defendant engaged in fraud, false pretense, false promise, misrepresentation, misleading statements, and deceptive practices in connection with the sale of services, in violation of Minn. Stat. § 325F.69(1), including omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class Members' PII and PHI.

159.    The Minnesota Consumer Fraud Act ("MCFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70." Minn. Stat. § 325F.69, subd. 1.

160.    Minn. Stat. §8.31, subds. 1 and 3a allows any person injured by a violation of Minn. Stat. § 325F.69 to bring a civil action to recover damages, together with costs and disbursements, including reasonable attorney's fees, and to receive other equitable relief as determined by the court.

161.    Defendant engaged in deceptive practices by failing to disclose to Plaintiff and Class members that its data security measures were inadequate to protect their sensitive information.

162.    Defendant represented, directly or indirectly, that it maintained appropriate safeguards to protect the personal and medical information of its patients. These representations were false, misleading, and deceptive.

163.    Defendant failed to inform Plaintiff and Class members about its deficient data security practices, which constitutes a material omission.

164.    Defendant intended that Plaintiff, and the Class, would rely on its representations and omissions regarding the secure of their personal and medical information.

165.    Plaintiff and the Class reasonably relied on Defendant's representations and omissions, believing that their sensitive information was secure.

166.    Defendant's deceptive acts and omissions directly caused the exposure of Plaintiff's and Class Members' sensitive information in the Data Breach. As a direct and proximate result of the Defendant's deceptive practices, Plaintiff and the Class suffered injuries, including the risk of identity theft, economic losses, loss of privacy, and the need for ongoing credit monitoring and identity theft services.

167.    Plaintiff and Class Members incurred actual damages due to the exposure of their sensitive information, including but not limited to costs associated with credit monitoring and identity theft protection, economic losses from unauthorized use of their information, and emotional distress. Plaintiff and the Class are entitled to recover statutory

damages under Minn. Stat. § 8.31, subd. 3a, due to Defendant's violation of Minn. Stat. § 325F.69.

168.   Plaintiff and the Class seek injunctive relief requiring Defendant to implement and maintain reasonable security measures to protect the sensitive information of its patients, to undergo periodic security audits, and to provide appropriate credit monitoring and identity theft protection services to affected individuals.

## COUNT EIGHT
## (VIOLATION OF THE MINNESOTA HEALTH RECORDS ACT)

169.   Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

170.   Defendant is a "Patient Information Service" as defined by Minn. Stat. § 144.291(Sub-2)(h), a "Provider" as defined by Minn. Stat. § 144.291(Sub-2)(i), and/or a "Related Health Care Entity" as defined by Minn. Stat. § 144.291(Sub-2)(k).

171.   Plaintiff and Class Members are "Patients" as defined by Minn. Stat. § 144.291(Sub-2)(g).

172.   The Plaintiff's and Class Members' Personal and Medical Information that was the subject of the Data Breach included "Health Records" as defined by Minn. Stat. § 144.291(Sub-2)(c).

173.   The Plaintiff's and Class Members' Personal and Medical Information that was the subject of the Data Breach included "Identifying Information" as defined by Minn. Stat. § 144.291(Sub-2)(d).

174.    The Plaintiff's and Class Members' Personal and Medical Information that was the subject of the Data Breach included information in an "Individually Identifiable Form" as defined by Minn. Stat. § 144.291(Sub-2)(e).

175.    Defendant violated the Minnesota Health Records Act by failing to protect confidential information and by disclosing the Health Records of Plaintiff and Class Members without first obtaining the requisite consent or other authorization.

176.    Defendant negligently released the Health Records of Plaintiff and Class Members in violation of the Health Records Act.

177.    As a direct and proximate result of Defendant's violation of Minn. Stat. §144.291 *et seq*., Plaintiff and Class Members now face an increased risk of future harm.

178.    As a direct and proximate result of Defendant's violation of Minn. Stat. §144.291 *et seq*., Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all Class Members, respectfully requests that the Court enter judgment in his favor and against Defendant as follows:

A.    Certifying the Class as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's counsel as Class Counsel under Federal Rule of Civil Procedure 23;

B.    Awarding Plaintiff and Class Members appropriate monetary relief,

including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.     Awarding Plaintiff and Class Members equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the Class, seeks appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.     Awarding Plaintiff and Class Members pre-judgment and post-judgment interest to the maximum extent allowable;

E.     Awarding Plaintiff and Class Members reasonable attorneys' fees, costs, and expenses, as allowable; and

F.     Awarding Plaintiff and Class Members such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated:  July 29, 2024                      Respectfully Submitted,

                                           *s/ Kent M. Williams*
                                           Kent M. Williams (MN #326859)
                                           WILLIAMS LAW FIRM
                                           1632 Homestead Trail
                                           Long Lake, MN 55356
                                           T: (612) 940-4452
                                           F: (952) 283-1525
                                           kent@williamslawfirmmn.com

                                           William Darryl Harris II
                                           HARRIS LEGAL ADVISORS, LLC
                                           *Pro Hac Vice* (forthcoming)
                                           3136 Kingsdale Center, Suite 246
                                           Upper Arlington, OH 43221
                                           T: (614) 504-3350
                                           F: (614) 340-1940
                                           will@harrislegaladvisors.com

                                           *Attorneys for Plaintiff Sammie Lee Austin*